JUSTICE TIMPONE delivered the opinion of the Court.
**396 Former middle school teacher Guillermo Santamaria was tried and convicted of aggravated sexual assault and official misconduct for his sexual relationship with a student at his school from the time she was fourteen. In this appeal we consider whether the trial court's admission of some sixty-five photographs -- approximately fourteen of which were sexually graphic -- amounted to plain error. Additionally, we examine whether the State committed reversible error in its summation by commenting on defendant's silence when the victim, H.B., accused him of having had sexual relations with her while she was a minor on multiple occasions over many years.
The Appellate Division reversed defendant's convictions and remanded the matter for a new trial. The panel found that, although defendant did not object to the admission of the photographs, the trial court should have excluded them sua sponte as cumulative and unduly prejudicial under N.J.R.E. 403 and as other-crime evidence or bad acts under N.J.R.E. 404(b). The panel also offered guidance for retrial, demonstrating support for defendant's argument that the State improperly commented on his silence during a recorded conversation with H.B.
We now reverse the Appellate Division's judgment ordering a new trial. We find neither error in the admission of the photographs under N.J.R.E. 403 nor reversible error concerning the **397 prosecutor's closing comments regarding the defendant's silence when H.B. made her recorded accusations. We nevertheless remind trial courts to be attentive to their gatekeeping *379 function as they curate the admission of evidence.
I.
A.
We elicit the facts from the record, including the trial testimony.
In 1997, thirteen-year-old eighth grader H.B. met forty-three-year-old defendant at the McGinnis Middle School in Perth Amboy, where he was employed as a science teacher. Defendant introduced himself as "the neighboring science teacher." They spoke several times a week by telephone and later added instant messaging. H.B. confessed to having problems with her parents at home.
In the spring of 1998, defendant encouraged H.B. to enroll in his twice-weekly Greek and Latin course. The class met regularly at the school and once at defendant's home in Perth Amboy. When H.B. graduated from middle school in June 1998, their communications continued, becoming more intimate. She viewed it as the equivalent of a dating relationship. They met often at a local park and in June or July 1998, they kissed "passionately" for the first time.
Shortly after her fourteenth birthday, H.B. met the defendant in the park. Defendant told her to lift up her skirt and warned that "this is going to hurt a little bit, but this is good for you." He then engaged in vaginal intercourse with her. The pattern continued as H.B. entered high school. She described the relationship as dominant-submissive, with the defendant in the dominant role.
At the same time, defendant was in a sexual relationship with a fellow teacher. In H.B.'s senior year, the teacher discovered in defendant's email account a photo of H.B. wearing what appeared to be a bikini top sitting in defendant's car. She reported it to the **398 then-named Division of Youth and Family Services (DYFS). Both defendant and H.B. denied any impropriety, causing DYFS to send a letter to H.B.'s mother indicating that they had done an investigation and found no basis for allegations of illicit sexual contact.
H.B. started college in the fall of 2002. Her liaisons with the defendant continued while she was in college. Their relationship became tense. He quizzed her on whether she was dating anyone and what she was doing in her free time. He occasionally visited her at her college. While on break, H.B. returned home and visited her old middle school to see her former teachers. She found defendant in his classroom and ultimately performed oral sex on him in an adjoining room. During winter break from college, H.B.'s mother saw an email from the defendant asking H.B. if she was prepared to submit to him in the ways he wanted and whether she was open to a future with him. At that time, H.B. did not confide in her parents the nature and extent of her relationship with defendant.
In 2009, H.B. called a family meeting with her parents and her siblings. She told them about her relationship with defendant but did not want to bring charges against him at that time. Approximately one year later, H.B. contacted a detective at the Middlesex County Prosecutor's Office with her information about the defendant. In addition to conducting numerous interviews, the detective obtained authorization to record conversations between defendant and H.B.
With the detective's help, H.B. scheduled a dinner with the defendant. She wore a hidden recording device to capture their conversation. At dinner, she questioned defendant about why he started the relationship with her when she was fourteen instead of when she was nineteen.
*380 She pointedly asked him, "How could you rape a fourteen-year-old?" Defendant made no admissions or denials; instead he steered the conversation away from the accusations.
**399 In addition to the recorded evidence, defendant's ex-wife turned over a CD of approximately sixty-five photos that she had found in her yard in 2002. The CD's contents ranged from hardcore photos of sexual acts between defendant and H.B. to suggestive pictures of H.B. in various states of undress. The detective also interviewed H.B.'s parents, defendant's co-workers, defendant's former girlfriends, defendant's ex-wife, and several other parties.
Defendant was arrested three days after the recorded dinner with H.B. On October 1, 2010, a Middlesex County grand jury indicted defendant on one count of first-degree aggravated sexual assault, contrary to N.J.S.A. 2C:14-2(a) ; two counts of second-degree sexual assault, contrary to N.J.S.A. 2C:14-2(c) ; and two counts of official misconduct, contrary to N.J.S.A. 2C:30-2.
B.
Before trial began, the prosecution, defense counsel, and the court collaborated on a questionnaire for potential jurors, including a question about the photographs: "During the trial there may be sexually graphic images displayed. Would that affect your ability to be fair and impartial? Why or why not?" Only those jurors who stated they would be impartial remained part of the jury selection process.
The trial judge offered to hold an N.J.R.E. 104 hearing without the jury to determine the admissibility of the photos on the CD found in the grass outside of defendant's home. Neither side took the judge up on his offer. While marking the photos, the judge again asked if there were any objections. And again, defense counsel did not object to admitting the photos into evidence, embracing their admission. The parties agreed that the photos were all taken shortly after H.B. turned eighteen.
The prosecution and defense each referenced the photos during the trial to support their respective theories of the case. Defendant argued primarily that he and eighteen-year-old H.B. had a consensual adult relationship. Defense counsel opened and closed on the photos. He urged the jury to view them as exhibiting **400 nothing more than the actions of two consenting adults. He attempted to undercut H.B.'s testimony, saying defendant had been "ambushed about a past that never happened."
The State argued that it is not credible that H.B. would have consented to pose for such a broad array of photos in so new of a relationship. Instead, according to the State, the photos were evidence of a long sexual relationship that substantially predated H.B.'s eighteenth birthday.
To underscore this argument, the prosecutor reviewed during summation before the jury the conversation recorded at the restaurant. She highlighted H.B.'s accusation that defendant had raped her when she was fourteen, noting that defendant did not respond to the accusation.
We never hear from [defendant], "What are you talking about?" Yes, that's what you should expect. That's exactly what you should expect. But what you got was this: What you got was every time [H.B.] brought up high school, he told -- he tried to distract her, "Oh, you're gorgeous. Let's talk about something else." Controlling the conversation away from -- because he doesn't know why she's there and, in fact, he said, "We'll talk about this when I have some trust in *381 you." This is not a stupid man, ladies and gentlemen.
....
He can't deny it, ladies and gentlemen, that's why he doesn't deny it in that taped statement.
....
He said, ... after she confronted him, "why did you have sex with me when I was fourteen?"
"Oh, your memory is much better than mine." Now, all of a sudden, he doesn't remember. That's convenient.
....
But what you should expect there ... that's what you should expect, him saying, "What are you talking about?" No. Instead you got a whole bunch, "Don't look at that, let's talk about this."
The jury found defendant guilty of all counts.
C.
Defendant appealed from his convictions, challenging, among other things, the admission of the photographs and the prosecutor's references to his silence during summation. After reversing **401 as to one count of official misconduct that it found beyond the statute of limitations, the panel reversed defendant's other convictions because it found the admission of the photographs to be reversible error.
The Appellate Division found the photographs to be of marginal probative value and relevance under N.J.R.E. 401 because they were taken after H.B. had turned eighteen years old. Although it noted that the photos "were logically connected to whether [defendant and H.B.] previously had a sexual relationship when H.B. was underage," the panel concluded that the photos' minimal probative value was substantially outweighed by the risk of undue prejudice and constituted the needless presentation of cumulative inflammatory evidence. The panel also determined the photos were too attenuated from the allegations of underage sex because they were taken "at least several weeks, if not years, after the alleged crimes occurred."
The Appellate Division concluded the photos of a nude eighteen-year-old engaged in various sexual acts with the defendant, a man thirty years her senior, were potentially inflammatory and stressed that H.B. was asked to identify herself and defendant in the pictures and to identify the defendant's penis and her vagina. Applying N.J.R.E. 403, the panel expressed concern about the likelihood that the photos could divert the jurors from a proper evaluation of guilt or innocence. The panel also made findings under N.J.R.E. 404(b) and concluded that the photos were not "intrinsically relevant" because they did not prove that defendant had sex with H.B. while she was underage. The panel concluded the photos should have been excluded from evidence under N.J.R.E. 404(b)"because they were not admissible as intrinsic evidence."
Because the panel reversed defendant's convictions, it did not need to reach the comments made by the prosecutor during her summation. The panel nonetheless admonished that prosecutors should "avoid comments that invade the rights bestowed on defendants, **402 including the right to remain silent." (citing State v. Muhammad, 182 N.J. 551, 568-69, 868 A.2d 302 (2005) ).
After the Appellate Division rendered its decision, the State filed a motion for reconsideration, contending that the panel may not have had copies of the photographs challenged on appeal and, therefore, found prejudice from the graphic nature of the photos "without having seen them." The Appellate Division denied the motion.
*382 On the heels of the denial of the reconsideration motion, the State filed a petition for certification which we granted. 232 N.J. 153, 178 A.3d 1269 (2018). Defendant cross-petitioned. We granted defendant's petition as well, limited to the two issues outlined above. 232 N.J. 295, 179 A.3d 1050 (2018).
II.
A.
The State argues that the Appellate Division's opinion granting a new trial should be reversed. The State maintains that the photos were not prejudicial under N.J.R.E. 403 because defendant failed to object to their use at trial and, instead, strategically relied on the photos to support his defense. Before jury selection, the prosecutor announced her intention to admit into evidence sexually explicit photos. The judge offered, but the parties both declined an evidentiary hearing. The State notes defense counsel reasoned that the photos merely showed H.B. as an adult voluntarily posing for photos -- not evidence of a crime -- and even encouraged the jury to review the photos.
The State also argues that the panel erroneously held that the photos should be excluded under N.J.R.E. 404(b) because the photos merely depicted an adult who posed voluntarily, such that no crime or bad act is implicated. The State emphasized that this was a case of sexual assault and that photos of a sexual nature are relevant to the case.
**403 Finally, the State disputes any impropriety in the prosecutor's comments on defendant's silence at dinner when H.B. accused him of sexual assault while she was a minor. The State insists that his silence was not at or near the time of defendant's arrest. His arrest came three days after the recorded dinner conversation. The State concludes since there was sufficient attenuation between the recording of the conversation and the defendant's arrest, no government compulsion exists. Lack of government compulsion, the State argues, makes the use of silence appropriate for impeachment purposes at trial.
B.
Amicus curiae the Attorney General of New Jersey makes arguments that echo those of the State. The Attorney General proffers that defense counsel used the photographs as part of his trial strategy to depict H.B. in an unflattering way, concluding that the defense should be precluded from now arguing that the photos were prejudicial.
C.
Defendant urges us to affirm the Appellate Division's conclusion that the trial court sua sponte should have excluded the photos pursuant to N.J.R.E. 401 or 402, because the photos were not relevant, under N.J.R.E. 403, because the photos were unduly prejudicial given their graphic content, or under N.J.R.E. 404(b), because the photos improperly permitted the jury to infer that defendant and H.B. engaged in sexual activity while she was underage.
According to defendant, the photos were not relevant to any charges involving allegations of underage sex with H.B. because they are evidence only of consensual sexual activity between two adults. He postulates that the jury may have found the photos grossly offensive and the mere fact that defendant took the pictures when he and H.B. were performing sex acts may have caused the jury to convict based on perceived immorality. Further, **404 defendant argues that jurors could unreasonably infer from such highly prejudicial evidence defendant had the proclivity *383 to commit the offenses for which he was on trial. Defendant also asserts that defense counsel's failure to object to the photos' admission was not "some grand stroke of strategic genius" but was "simply a matter of neglect."
Defendant also agrees with the panel that the prosecutor's comment regarding defendant's silence when H.B. accused him of a long-term sexual relationship and the rape of a minor infringed on his federal and state constitutional rights to remain silent. Although defendant concedes that his statements made during dinner were admissible since he was not in custody at the time he made them, he argues that it was improper for the prosecutor to argue in summation that his silence was evidence of his guilt.
III.
If a defendant, as here, does not object or otherwise preserve an issue for appeal at the trial court level, we review the issue for plain error. R. 2:10-2. We must disregard any unchallenged errors or omissions unless they are "clearly capable of producing an unjust result." Ibid.
Plain error is a high bar and constitutes "error not properly preserved for appeal but of a magnitude dictating appellate consideration." State v. Bueso, 225 N.J. 193, 202, 137 A.3d 516 (2016) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 2:10-2 (2016) ). The "high standard" used in plain error analysis "provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." Id. at 203, 137 A.3d 516.
"A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error" because " 'to rerun a trial when the error could easily have been cured on request[ ] would reward the litigant who suffers an error for tactical advantage either in the **405 trial or on appeal.' " State v. Ross, 229 N.J. 389, 407, 163 A.3d 278 (2017) (quoting State v. Weston, 222 N.J. 277, 294-95, 118 A.3d 331 (2015) ).
The admission of all the photographs was raised for the first time on appeal by defendant. We reverse only if any error was "clearly capable of producing an unjust result." R. 2:10-2. The same standard applies to our review of the prosecutor's remarks during summation, to which defense counsel did not object.
IV.
We begin by considering the admission of the photographic evidence.
A.
Beginning our analysis with N.J.R.E. 401, we consider whether the photographs are relevant. N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Relevant evidence "need not be dispositive or even strongly probative in order to clear the relevancy bar." State v. Cole, 229 N.J. 430, 447, 163 A.3d 302 (2017) (quoting State v. Buckley, 216 N.J. 249, 261, 78 A.3d 958 (2013) ). Instead, the relevancy threshold is met "[o]nce a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case." Id. at 448, 163 A.3d 302 (quoting State v. Burr, 195 N.J. 119, 127, 948 A.2d 627 (2008) ). Under N.J.R.E. 402, "all relevant evidence is admissible" subject to exceptions provided for elsewhere in the rules.
The parties here all agree that the photographs were taken after H.B. turned eighteen, apparently during the several *384 weeks between H.B.'s July 5 birthday and her leaving for college in mid-August. The sheer number of photographs -- as well as the graphic nature of the sexual acts depicted mere weeks after H.B. turned eighteen -- is relevant to establishing a pre-existing relationship between defendant and H.B., which in this case would **406 mean a relationship while H.B. was underage. The photos are therefore intrinsic to the prosecution's case.
Defendant argues that the photographs are not relevant because his relationship with H.B. was consensual and legal at the time the photographs were taken. But H.B. testified, without any objection, that her relationship with defendant began well before her eighteenth birthday and continued afterward. That testimony included extensive recitation about their relationship from her eighteenth birthday until it ended. It is incongruent to argue that the photographs are in no way relevant to the charges here without simultaneously challenging H.B's testimony about the relationship depicted in the photographs. Defendant concedes H.B.'s testimony about events occurring after her eighteenth birthday was relevant. We find no compelling reason why the same logic would not apply to the photographs. The relationship once H.B. reached legal age remains relevant as a continuation of the relationship begun when H.B. was a minor.
B.
Relevant evidence may still "be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) ... needless presentation of cumulative evidence." N.J.R.E. 403. Evidence should be barred under N.J.R.E. 403 if "the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." Cole, 229 N.J. at 448, 163 A.3d 302 (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421, 283 A.2d 513 (1971) ). Inflammatory evidence "must be excluded if other probative, non-inflammatory evidence exists." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 500, 734 A.2d 1147 (1999). The party urging the exclusion of evidence under N.J.R.E. 403 retains the burden "to convince the court that the N.J.R.E. 403 considerations should control."
**407 Rosenblit v. Zimmerman, 166 N.J. 391, 410, 766 A.2d 749 (2001) (quoting Biunno, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 403 (2000) ).
Here, the photographs depicted H.B. in various states of undress either alone or engaging in sexual acts with defendant. The trial judge and the parties took steps to mitigate any potential inflammatory effect from the pictures by raising the issue in the jury questionnaire. The trial court spoke with jurors about the graphic nature of the pictures to ensure they would be comfortable examining them for their intended purpose. The prosecutor's summation clarified the use of the pictures:
If this -- if this relationship didn't happen until it was legal, do you think that [H.B.] ... would be that comfortable in the way she's posing and that sexual, if this relationship -- you don't go from zero to sixty in a month, ladies and gentlemen. That's just not reasonable. That's not rational.
Defendant argues that the photographs were cumulative in nature because both defendant and H.B. admitted to a consensual relationship once H.B. was eighteen and H.B. provided testimony about their consensual relationship. Yet, both the nature and number of photographs have the *385 capacity to demonstrate the depth and length of the relationship. Given that H.B. turned eighteen in early July and the pictures were taken in July or early August, the sheer volume and intimate nature of the photographs is significant and highly probative.
As the State pointed out, an eighteen-year old in the first weeks of a relationship is not likely to consent to a sexual partner's taking sixty-five nude and semi-nude photographs, particularly when fourteen of those photographs depict hardcore sexual acts. Further, the photographs support H.B.'s testimony about the dominant-submissive nature of their relationship as defendant appeared to be controlling the photographs and never displayed his face in any of them.
Therefore, it was not error to admit the photographs. The evidence was admissible under N.J.R.E. 403 as its probative value outweighed any prejudicial effect. We also note that it is markedly **408 unfair for the panel to have judged the photos as excessive without having viewed them.
Moreover, defendant was also provided several opportunities to dispute the admission of the photographs. At the beginning of the case, the photographs were briefly discussed before the trial court asked if any N.J.R.E. 104 hearings were necessary. Defense counsel replied: "I don't think so." During the trial itself, the State introduced the photographs during defendant's ex-wife's testimony and then again during H.B.'s testimony, systematically reviewing numerous photographs and questioning each witness about various details in the photographs. Defense counsel did not object to any of the photographs and, on cross-examination, even briefly questioned H.B. further about the photographs. During the marking of exhibits, the trial court again discussed the "graphic photographs," asking "[a]ny objections?" Defense counsel replied: "No, judge."
Because we find the photographs were admissible under N.J.R.E. 403, the trial court did not err by not sua sponte excluding them under its gatekeeping function. The trial court provided the opportunity for counsel to hold a 104 hearing and then properly deferred to each party's strategic and tactical decisions in allowing each party to try the case as it saw fit.
Importantly, defendant did not merely fail to object to the photographs but instead strategically relied on the photographs as part of his defense. Defense counsel's opening and closing statements each referenced the photographs and argued their role as evidence of defendant's innocence. In opening, defendant's attorney stated:
The State is going to show you some pictures. I want you to look at those pictures. I want you to hear about this [sic] pictures. When were those pictures taken? And you're going to hear those pictures, they're not evidence of a crime. They're not evidence of wrongdoing and they're very -- they're graphic pictures, no doubt about that. You may be offended. You got to understand that those pictures, those are not a crime, because at that point in time it was a legal consensual relationship that they were involved in.
[ (emphasis added).]
In summation, defendant's attorney stated:
**409 [T]here were some pictures and they were sexually explicit. But what do we know about those pictures? ... [H.B.] was eighteen .... The pictures are shocking because it's a person having sex with a stranger, I understand that. Look at the pictures. This is a woman exploring her sexuality, the legal consensual *386 thing. Not evidence of any wrongdoing.
[ (emphasis added).]
Defendant cannot be permitted to argue now on appeal that it was error on the part of the court to admit the photos. Although we find it was not error to admit the photos, even if it were error, a party cannot strategically withhold its objection to risky or unsavory evidence at trial only to raise the issue on appeal when the tactic does not pan out. See State v. Harper, 128 N.J. Super. 270, 277, 319 A.2d 771 (App. Div. 1974) ("Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal."); cf. State v. Jenkins, 178 N.J. 347, 359, 840 A.2d 242 (2004) (discussing invited error doctrine). Plain error has intentionally been created as a high bar for parties to meet in order to encourage litigants to raise any objections to evidence at the trial level where the court can best "forestall or correct a potential error," in a timely manner. Bueso, 225 N.J. at 203, 137 A.3d 516 (collecting cases).
Of course, if defendant had objected and asked for the court to limit the number of photographs, the court's duty is to exercise its gatekeeping function and assess whether the evidence was cumulative and should have been limited. See N.J.R.E. 403. Here, defendant both failed to object to the photographs at trial and relied on the photographs as part of his case strategy. The Appellate Division here erred by finding plain error in the admission of the photographs under N.J.R.E. 403.
C.
N.J.R.E. 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." Significantly, however, "evidence that is intrinsic to **410 the charged crime is exempt from the strictures of Rule 404(b)." State v. Rose, 206 N.J. 141, 177, 19 A.3d 985 (2011) (citing 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239 at 445 (1978) ). In Rose, this Court considered the concept of intrinsic evidence and its impact on Rule 404(b) :
Whenever the admissibility of uncharged bad act evidence is implicated, a Rule 404(b) analysis must be undertaken. The threshold determination under Rule 404(b) is whether the evidence relates to "other crimes," and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403.
[ Id. at 179, 19 A.3d 985.]
In determining whether evidence is intrinsic or related to "other crimes," this Court quoted United States v. Green, 617 F.3d 233 (3d Cir. 2010), which stated:
we ... reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it "directly proves" the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of "other crimes, wrongs, or acts." If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." But all else must be analyzed under Rule 404(b).
As a practical matter, it is unlikely that our holding will exclude much, if any, evidence that is currently admissible as background or "completes the story" evidence under the inextricably intertwined *387 test. We reiterate that the purpose of Rule 404(b) is "simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence." "No other use of prior crimes or other bad acts [is] forbidden by the rule," and one proper use of such evidence "is the need to avoid confusing the jury."
[ Rose, 206 N.J. at 180, 19 A.3d 985 (alteration in original) (quoting Green, 617 F.3d at 248-49 (internal citations omitted) ).]
As such, if evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of Rule 403.
The Appellate Division found the entire CD of photographs to be inadmissible under N.J.R.E. 404(b) as other-acts evidence whose apparent prejudice outweighed its probative value.
**411 Here, the State used the photographs to demonstrate that the consensual relationship admitted to by both parties logically must have preceded H.B.'s majority based on the highly intimate nature of the photographs taken shortly after H.B. turned eighteen. That use of the photographs made the evidence intrinsic to the charged crime as proof of the ongoing relationship between H.B. and defendant. The photographs served to demonstrate the control defendant had over H.B., and suggested defendant groomed her over their years-long sexual relationship beginning shortly after H.B.'s fourteenth birthday. The photographs were intrinsic, not evidence of "other crimes, wrongs, or acts," so the Appellate Division was incorrect to find the photographs should have been excluded under 404(b). N.J.R.E. 404(b) (emphasis added).
Having determined that defendant's convictions should not have been reversed on the basis of the admitted photographs, we turn next to defendant's challenge of the prosecutor's remarks in summation.
V.
A.
The Fifth Amendment of the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Although the same right is not expressly included in the New Jersey Constitution, the privilege against self-incrimination is present in New Jersey common law and statutory law. See N.J.S.A. 2A:84A-19 ("[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate ....") (emphasis added); State v. S.S., 229 N.J. 360, 381, 162 A.3d 1058 (2017) (discussing embodiment of the Fifth Amendment privilege in New Jersey law). "The practical effect of the privilege to remain silent is ... 'that when a **412 defendant expressly refuse[s] to answer, no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept ....' " State v. Deatore, 70 N.J. 100, 115, 358 A.2d 163 (1976) (quoting State v. Ripa, 45 N.J. 199, 204, 212 A.2d 22 (1965) ). This case does not invoke the scenario of official compulsion because we are not dealing with an officer interrogating a witness.
Importantly, "pre-arrest silence that is not 'at or near' the time of arrest, when there is no government compulsion and the objective circumstances demonstrate that a reasonable person in a defendant's position would have acted differently, *388 can be used to impeach that defendant's credibility with an appropriate limiting instruction." State v. Stas, 212 N.J. 37, 58, 50 A.3d 632 (2012) (citing State v. Brown, 190 N.J. 144, 158-59, 919 A.2d 107 (2007) ; State v. Brown, 118 N.J. 595, 613-14, 573 A.2d 886 (1990) ). Pre-arrest silence "cannot ... be used as substantive evidence of a defendant's guilt." Ibid.
B.
Although H.B. was wearing a body recorder, she spoke with defendant as a private citizen, in a public place, with defendant unaware of any police presence. See State in Interest of J.D.H., 171 N.J. 475, 477-78, 481, 795 A.2d 851 (2002) (upholding admission of defendant's incriminating statement made during a recorded phone call with victim who asked questions provided by detective). Defendant argues that H.B. was acting as an agent of the police, which precludes the prosecutor from commenting on defendant's silence in response. The mere use of a recording device to allow law enforcement to listen in on a conversation does not show government compulsion.
It is noteworthy that the prosecutor's comments questioning defendant's response to H.B.'s accusations were made only during summation and were fair comment. The court twice instructed the jury not to interpret anything said during summation **413 as evidence. "We presume that the jury faithfully followed [the] instruction[s]" it received, State v. Miller, 205 N.J. 109, 126, 13 A.3d 873 (2011), and was aware that the prosecutor's remarks were argumentative, not evidentiary, in nature.
A return to the language of New Jersey's statutory privilege against self-incrimination is informative: "[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate ...." N.J.S.A. 2A:84A-19. Defendant's "right to refuse to disclose" is not implicated when, as here, (1) there is no action; and (2) he did not disclose "to a police officer or other official." Ibid.
The State's comments on defendant's silence were appropriate and did not infringe on defendant's right to remain silent or privilege against self-incrimination. The Appellate Division's guidance on the prosecutor's comments on silence should not be adopted.
VI.
We reverse the judgment of the Appellate Division and remand for consideration of defendant's remaining arguments.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.