**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1374-23
A-2164-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

THOMAS J. DINAPOLI,

    Defendant-Respondent.

_____

Argued September 30, 2024 – Decided January 28, 2025

Before Judges Sabatino and Gummer.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Indictment No. 23-07-0473.

James C. Brady, Assistant Prosecutor, argued the cause for appellant (William A. Daniel, Union County Prosecutor, attorney; James C. Brady, of counsel and on the briefs).

Timothy R. Smith argued the cause for respondent (Caruso Smith Picini, PC, attorneys; Timothy R. Smith, of counsel; Zinovia H. Stone, on the briefs).

PER CURIAM

In this alleged vehicular-homicide case, the State on leave appeals from two orders entered by the trial court: one denying the State's motion to preclude the testimony of defendant's three expert witnesses and one granting defendant's motion to preclude the testimony of the State's forensic toxicologist regarding defendant's alleged use of or impairment by cocaine or benzoylecgonine (BZE).[1] Perceiving no abuse of discretion or legal error, we affirm the order precluding in part the testimony of the State's expert. However, we vacate the order admitting defendant's expert witnesses and remand the case for a pretrial hearing concerning those witnesses pursuant to N.J.R.E. 104.

I.

At approximately 3:44 p.m. on June 4, 2019, a Mazda driven by defendant was traveling east when it crossed the street's double yellow lines and struck a westbound Chevrolet. An analysis of a sample of defendant's blood taken over four hours after the crash indicated the presence of 7-aminoclonazepam, which is a metabolite of the prescription drug Clonazepam, and BZE, which is a metabolite of cocaine.

---

[1] We consolidated these back-to-back appeals for purposes of issuing a single opinion.

A-1374-23

Michelina Mele was one of the passengers in the Chevrolet. After the crash, Mele was transported and subsequently admitted to a hospital. She was described as being "conscious but confused" and having pain in her chest and leg. Scans and x-rays taken after the crash showed fractures to Mele's ribs and patella and lung contusions. Mele was ninety-four years old and had a history of dementia and Alzheimer's disease; she was deemed a poor candidate for surgery. She had an advance directive for health care instructing that life-prolonging measures, including respiratory support such as ventilation, should not be initiated if she "experience[d] extreme mental or physical deterioration such that there is no reasonable expectation of recovery or regaining a meaningful quality of life[.]" Family members requested she be placed on "comfort care." Mele was pronounced dead on June 5, 2019, at 5:45 p.m. After performing an autopsy, Dr. Beverly Leffers, the county medical examiner, concluded Mele's cause of death was "blunt impact injuries" sustained in an "accident."

On January 8, 2020, a grand jury returned an indictment, charging defendant with one count of second-degree vehicular homicide, N.J.S.A. 2C:11-5(a) and two counts of fourth-degree assault by auto, N.J.S.A. 2C:12-1(c)(2). A grand jury subsequently issued a superseding indictment, charging defendant

A-1374-23

with the original three charges as well as third-degree strict liability vehicular homicide, N.J.S.A. 2C:11-5.3(a), and third-degree witness tampering, N.J.S.A. 2C:28-5(a).

Before trial, defendant produced reports authored by Marc Polimeni, M.D., an internist, and Robert J. Pandina, Ph.D., a psychologist. The trial judge denied the State's motion to preclude the testimony of Dr. Pandina and reserved on the motion to preclude the testimony of Dr. Polimeni, pending a N.J.R.E. 104 hearing.

Defendant's first trial ended in a mistrial, for reasons not pertinent here, after several witnesses had testified during the State's case in chief, including Dr. Sabeen Khan, Mele's treating physician, and Dr. Leffers. In her testimony during an N.J.R.E. 104 hearing, Dr. Leffers confirmed she had found "blunt impact injuries" as the cause of Mele's death and that "accident" was the manner of death. She opined Mele's injuries "taken together . . . with her preexisting condition were life threatening." In her testimony, Dr. Khan stated "do not resuscitate" (DNR) and "do not intubate" instructions had been put in place regarding Mele "after [a] discussion with [her] son at bedside." Dr. Khan opined Mele's pulse oxygen level had dropped "[m]ost likely from the trauma . . . to her chest wall" caused by the crash. She concluded the trauma to her lungs caused

Mele's death, and but for the crash, Mele would not have died when she did. Donna Papsun, the State's expert witness in forensic toxicology, testified during two N.J.R.E. 104 hearings regarding the admissibility of her opinions and testimony concerning serological evidence. The trial judge denied defendant's motions to preclude her testimony, and Papsun testified before the jury.

After the mistrial, defendant produced reports from Dr. Polimeni, Dr. Pandina, and Dr. Henry Velez, an internist and pulmonologist. Dr. Polimeni had been asked to review Mele's cause of death. He opined that none of the injuries she had sustained in the crash were life threatening and that she had been placed on hospice care due to her Alzheimer's disease and not the injuries she had sustained in the crash. He believed she had been "treated appropriately for" hospice care. He concluded Mele had died from the Alzheimer's disease, a terminal illness and a natural cause of death. In his August 1, 2023 report, Dr. Pandina focused on "the impact of medications administered during the course of treatment" and concluded Mele's "physiological processes and functionality . . . . were significantly compromised because of the actions of narcotic medications administered to her during her treatment at [the] hospital on June 4 and 5, 2019." Dr. Pandina also indicated "no advanced directive was in place" while Mele was a patient at the hospital and questioned "why staff placed her

on DNR status" and "abandoned" "life sustain[ing] efforts." In his report, Dr. Velez acknowledged the existence of an advance directive and that she had received treatment "consistent with the goals of hospice." However, he opined her "poor prognosis" was "overstated" and "it was more probable than not, that if Ms. Mele had not been placed on hospice care, and if she had not suffered respiratory depression and hypoxia due to the use of opioids," Mele "most probably would have survived the injuries of her accident." He concluded the "motor vehicle accident was not the proximate cause of her death."

In September 2023, defendant moved to preclude the testimony of Papsun related to defendant's use of cocaine and Clonazepam. That same day, the State moved to preclude the testimony of Drs. Velez, Polimeni, and Pandina on the grounds that their opinions contradicted accepted medical standards and were legally impermissible under the model jury charge for causation.

After hearing argument, the trial court denied the State's motion and requested supplemental submissions regarding defendant's motion, stating it would "reserve . . . and [would] wait to hear when [defendant's expert witnesses] testify . . . to see whether they're qualified to testify in the area that they are offered for." The State asked the court to conduct a pretrial hearing regarding the qualifications of defendant's expert witnesses; the court denied that request.

A-1374-23

The court entered an order on December 1, 2023, memorializing its denial of the State's motion. In an amplification submitted pursuant to Rule 2:5-1(d), the court explained it had denied the State's motion in part because "[c]ausation is clearly a fact issue in this case" and because the State "intend[ed] to present [its] own experts to testify regarding causation," defendant should have the same opportunity. The court acknowledged the State's argument that "the decision to place someone on palliative care is analogous to a removal of life support" and recognized that "neither removal of life support nor palliative care absolve a defendant of liability for the death of a victim as a matter of law." The court, however, concluded the State has the burden to prove causation and the jury determines whether the State meets that burden. The court indicated it could provide the jury with appropriate instructions addressing the issue of causation under these circumstances.

After considering the parties' submissions and hearing additional argument, the trial court issued an order and written decision granting defendant's motion as to the preclusion of "testimony of defendant's alleged use of and/or impairment by cocaine or [BZE]." The court found the State had presented "compelling evidence of defendant's Clonazepam impairment" but had not presented expert opinion to support its theory that "defendant's

[C]lonazepam intoxication, which caused drowsiness, was exacerbated by the fatigue caused by the 'crashing' effects of coming down after the stimulant effect of cocaine dissipated."

The court found Papsun's written opinion "was devoid of any opinion as to whether the finding of cocaine metabolites in defendant's blood had any effect on defendant's driving at the time of the incident." The court cited the testimony Papsun had given at trial in which she opined defendant could have ingested cocaine before or after the crash. When asked if any scientific basis existed supporting a conclusion defendant "was experiencing either the rush or the crash side of cocaine" when he was operating his car on the day of the collision, Papsun responded: "I cannot say anything with decisiveness about cocaine in terms of the crash." Because Papsun was unable to opine about what, if any, effect the BZE found in defendant's blood sample had on his driving, the court found the BZE evidence the State sought to introduce was not relevant under N.J.R.E. 401 in that it did not have the tendency to prove or disprove a fact at issue in the case and was excluded under N.J.R.E. 403 because any probative value it had was "significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues."

We granted the State's motions for leave to appeal both orders. The State argues the trial court abused its discretion in denying its motion because the opinions of defendant's expert witnesses are irrelevant and constitute inadmissible net opinions.[2] The State also faults the court for denying its request for a pretrial hearing regarding the witnesses' qualifications. The State argues the trial court abused its discretion in declining to follow previous decisions about Papsun's testimony and granting defendant's motion to preclude it.

## II.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." State v. Cotto, 471 N.J. Super. 489, 531 (App. Div. 2022) (quoting Townsend v. Pierre, 221 N.J. 36, 52 (2015)). "Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." Nicholas v. Hackensack Univ. Med. Ctr., 456 N.J. Super. 110, 117 (App. Div. 2018) (quoting Carey v. Lovett, 132 N.J. 44, 64 (1993)). "Under that standard, an appellate court should not substitute its own judgment

---

[2] We decline to address the State's net-opinion argument regarding defendant's expert witnesses. In its amplification, the trial court explained the State had not raised that issue in the briefs or oral argument before it. Our review of the oral argument transcript is consistent with that statement. See Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 145 (App. Div. 2018) (applying "well-settled" principle that, subject to the plain error rule, appellate court will not consider an issue that was not raised before the trial court).

for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Kuropchak, 221 N.J. 368, 385-86 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

"N.J.R.E. 702 governs the admissibility of expert testimony." State v. Olenowski, 253 N.J. 133, 143 (2023). That rule "provides that '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.'" State v. Derry, 250 N.J. 611, 632 (2022) (alteration in original) (quoting N.J.R.E. 702). "[T]he trial court must act as a gatekeeper to determine 'whether there exists a reasonable need for an expert's testimony.'" State v. Covil, 240 N.J. 448, 465 (2020) (quoting State v. Nesbitt, 185 N.J. 504, 514 (2006)).

In order to assist the trier of fact and thereby be admissible, expert testimony, like any other evidence proffered at trial, must be relevant to the issues to be determined by the fact finder. Olenowski, 253 N.J. at 148 (finding "an expert's testimony" should be based "on a reliable foundation and [be] relevant . . . .") (quoting In re Accutane Litig., 234 N.J. 340, 384 (2018)). N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in

10

reason to prove or disprove any fact of consequence to the determination of the action."  "Relevant evidence 'need not be dispositive or even strongly probative in order to clear the relevancy bar.'"  State v. Santamaria, 236 N.J. 390, 405 (2019) (quoting State v. Cole, 229 N.J. 430, 447 (2017)).  Rather, "the relevancy threshold is met '[o]nce a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case.'"  Ibid. (alteration in original) (quoting Cole, 220 N.J. at 448).  "The inquiry is 'whether the thing sought to be established is more logical with the evidence than without it.'"  State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).

"Relevant evidence may still 'be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury . . . .'"  Santamaria, 236 N.J. at 406 (quoting N.J.R.E. 403).  N.J.R.E. 403 bars the admission of evidence "if 'the probative value of the evidence is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues.'"  Ibid. (alteration in original) (internal quotation marks omitted) (quoting Cole, 229 N.J. at 448).

A-1374-23

A.

The expert testimony at issue in both motions relates to the charge of second-degree vehicular homicide, N.J.S.A. 2C:11-5(a). To determine the relevancy of the expert witnesses' testimony, we must consider the elements of that crime. To convict someone of that crime, the State must prove "beyond a reasonable doubt three elements: (1) that 'defendant was driving a vehicle'; (2) that 'defendant caused the death'; and (3) that the death was caused by driving a vehicle recklessly." Buckley, 216 N.J. at 262 (quoting State v. Eldridge, 388 N.J. Super. 485, 494 (App. Div. 2006)). Because it is undisputed defendant drove the vehicle that day, only the issues of causation and recklessness remain.

N.J.S.A. 2C:2-2(b)(3) defines the reckless mental state the State must prove to convict someone of violating N.J.S.A. 2C:11-5(a). Buckley, 216 N.J. at 262. N.J.S.A. 2C:2-2(b)(3) provides:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

Proof the defendant fell asleep while driving, was driving while intoxicated, or failed to maintain a lane "may give rise to an inference that the defendant was driving recklessly." N.J.S.A. 2C:11-5(a); see also State v. Green, 236 N.J. 71, 86 (2018) (finding that N.J.S.A. 2C:11-5(a) permits but does not require the jury to "infer recklessness" based on evidence of intoxication).

"[T]he State must also establish that the recklessness caused the death." State v. Parkhill, 461 N.J. Super. 494, 501 (App. Div. 2019). N.J.S.A. 2C:2-3 sets forth the applicable elements of causation:

> (a) Conduct is the cause of a result when:
>
> > (1) It is an antecedent but for which the result in question would not have occurred; and
> >
> > (2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.
>
> . . . .
>
> (c) When the offense requires that the defendant recklessly . . . cause a particular result, the actual result must be within the risk of which the actor is aware . . . or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

Thus, N.J.S.A. 2C:11-5(a) "initially requires the jury to determine whether there is 'but for' causation" under N.J.S.A. 2C:2-3(a)(1).  Buckley, 216 N.J. at 254.  "If that threshold determination is made, . . . the causation inquiry is governed by the two-pronged standard of N.J.S.A. 2C:2-3(c)."  Ibid.

"Under the first prong of that test, the statute predicates a finding of causation upon proof that 'the actual result' was 'within the risk of which the actor is aware.'"  Ibid. (quoting N.J.S.A. 2C:2-3(c)).  "In a vehicular homicide case, the 'actual result' is 'the victim's death in the accident.'"  Parkhill, 461 N.J. Super. at 501 (quoting Buckley, 216 N.J. at 264).  Under the first prong, the causation element is satisfied "when the actual result occurs in the same manner and is of the same character as the . . . [risked] result."  Ibid. (first alteration and omission in original) (quoting State v. Martin, 119 N.J. 2, 12 (1990)).

"'[W]hen the actual result occurs in the same character, but occurred in a different manner from that [risked],' then the jury must consider the second prong" of N.J.S.A. 2C:2-3(c).  Ibid. (second alteration in the original) (quoting Martin, 119 N.J. at 13).  Under the second prong, "it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result."  Buckley, 216 N.J at 265 (quoting State v. Pelham, 176 N.J. 448, 461 (2003)).

"An 'intervening cause' occurs when an event 'comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury.'" Ibid. (quoting Pelham, 176 N.J. at 461). "Thus, an 'intervening cause' denotes an event or condition which renders a result 'too remote, accidental in its occurrence, or dependent on another's volitional act' to fairly affect criminal liability or the gravity of the offense." Ibid. (quoting Pelham, 176 N.J. at 461-62.).

In Pelham, the Court held a jury determining a defendant's guilt under N.J.S.A. 2C:11-5 "may be instructed, as a matter of law, that a victim's determination to be removed from life support is a foreseeable event that does not remove or lessen criminal responsibility for death." 176 N.J. at 451. In that case, the defendant was allegedly intoxicated when the vehicle he was driving struck a vehicle driven by the victim, who suffered "catastrophic injuries," including paralysis from the chest down, and was placed on a ventilator. Id. at 452. About five months later, after his condition had somewhat improved but then "regressed," his family in accordance with his wishes decided to remove the ventilator. Id. at 453-54. He died two hours after its removal. Ibid.

The Court in <u>Pelham</u> held the "removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability." <u>Id.</u> at 465. The Court found:

> Removal of life-sustaining treatment is a victim's right. It is thus foreseeable that a victim may exercise his or her right not to be placed on, or to be removed from, life support systems. Because the exercise of the right does not break unexpectedly, or in any extraordinary way, the chain of causation that a defendant initiated and that led to the need for life support, it is not an intervening cause that may be advanced by the defendant.
>
> [<u>Id.</u> at 466.]

The Court concluded:

> if defendant's actions set in motion the victim's need for life support, without which death would naturally result, then the causal link is not broken by an unforeseen, extraordinary act when the victim exercises his or her right to be removed from life support and thereupon expires unless there was an intervening volitional act of another, such as gross malpractice by a physician.
>
> [<u>Id.</u> at 467.[3]]

---

[3] Courts in other states are divided concerning this reasoning. <u>See, e.g.</u>, <u>People v. Jones</u>, 325 Cal. Rptr. 3d 425, 435 (Cal. Ct. App. 2024) (finding "[t]he removal of life support was not so unusual and did not produce harm so far beyond the risk created by [the defendant's] actions that it would be unfair to hold [the defendant] responsible for [the victim's death]"), <u>review denied</u>, (Nov. 20, 2024); <u>State v. Stribling</u>, 818 S.E.2d 563, 566 (Ga. 2018) (in case involving

16

In Pelham, the victim died after his family chose to have him removed from life support systems. Id. at 453-54. In this case, Mele died after her family comparably chose not to have her placed on life support systems. In determining issues of causation, we see no legal basis to distinguish between a decision to take someone off a ventilator and a decision to not put someone on a ventilator. Thus, we conclude the holding in Pelham applies equally in a situation involving a family's decision not to place the victim on life support systems and that the causal link between a "defendant's actions [that] set in motion the victim's need for life support . . . is not broken by an unforeseen, extraordinary act" when a victim or her family chooses not to place her on life support systems. Id. at 467. See Jones, 325 Cal. Rptr. 3d at 434 (finding "[b]ased on [the defendant's] actions, it is reasonable to contemplate a scenario where medical treatment

_____

victim's removal from life support, Court holds evidence was sufficient for jury to conclude the defendant's actions proximately caused victim's death). But see, State v. Abella, 454 P.3d 482, 501-02 (Haw. 2019) (in case with "evidence suggesting that the prognosis for the victim was uncertain at the time the life support was discontinued," Court expressly adopts the reasoning of Justice Albin's dissent in Pelham and finds removal from life support may be an intervening cause of death); State v. Smith, 835 N.W.2d 1, 7-8 (Minn. 2013) (declining to hold a victim's refusal of medical care could never as a matter of law be a superseding cause of death, Court finds evidence was sufficient at trial for jury to find a DNR order was not a superseding cause of victim's death).

17                                                                          A-1374-23

might prevent death but is nonetheless undesirable because the victim could not be restored to a quality of life she or he would tolerate as acceptable").

But this case involves more than an unquestioned application of a DNR order.  Dr. Pandina disputes the existence of a DNR order and challenges the decision to abandon life-sustaining efforts.  Dr. Polimeni does not seem to dispute the existence of a DNR order and opines Mele was "treated appropriately" for end-of-life care but asserts the need for that care was not caused by the crash.  Dr. Velez concedes the existence of a DNR order but finds that order was followed based on an "overstated poor prognosis."

Though inconsistent and all over the map, the reports of defendant's experts suggest evidence that potentially could support a conclusion an intervening cause – a decision to place Mele on comfort care that was based on erroneous advice about her condition or that was not related to a condition caused by the crash – broke the chain of causation from defendant's actions.  See Pelham, 176 N.J. at 461 (recognizing "a doctor's malpractice in treating a crime victim [could] constitute[] an intervening cause that had broken the chain of causation after a criminal defendant's act"); Jones, 325 Cal. Rptr. 3d at 434 (noting the record contained "no evidence that the withdrawal of life support was 'grossly improper medical treatment' or 'the sole cause of death and hence

18

an unforeseeable intervening cause'" (emphasis omitted) (internal quotation marks omitted) (quoting State v. Funes, 28 Cal. Rptr. 2d 758, 769 n.9 (Cal. Ct. App. 1994))).

Given their inconsistencies, we cannot determine solely from the reports of defendant's expert witnesses whether their testimony at trial would support the existence of an intervening cause and, hence, would be admissible. The best way to make that determination is by consideration of their testimony at a pretrial hearing conducted pursuant to N.J.R.E 104. Through that effort, the trial court is better able to determine defendant's theory of the case, whether the testimony of the three proposed witnesses is relevant, and whether any or each of them should testify at trial. Accordingly, we vacate the December 1, 2023 order denying the State's motion to preclude the testimony of Drs. Pandina, Velez, and Polimeni and remand with instructions the trial court conduct a N.J.R.E. 104 hearing consistent with this opinion.

The trial court previously denied the State's request to conduct a N.J.R.E. 104 hearing regarding the qualifications of defendant's expert witnesses before the trial. While we appreciate the trial court's concerns, we have no doubt in this case, which already was the subject of a mistrial, the better course is to

19

conduct an evidentiary hearing to address the admissibility of the testimony of these potentially critical witnesses before the second trial begins.

B.

We now turn to the State's appeal of the order granting in part defendant's motion regarding Papsun, precluding her testimony concerning defendant's alleged use of or impairment by cocaine or BZE. Relying on the law-of-the-case doctrine, the State faults the trial court for granting defendant's motion when the court previously had denied motions to preclude her testimony and had allowed her to testify at trial before the court declared a mistrial.

"The law-of-the-case doctrine is a non-binding rule intended to prevent relitigation of a previously resolved issue in the same case." State v. Njango, 247 N.J. 533, 544 (2021) (quoting State v. K.P.S., 221 N.J. 266, 276 (2015)). Courts, however, "need not 'slavishly follow an erroneous or uncertain interlocutory ruling,' . . . but are instead entitled to reconsider and set aside prior interlocutory orders and rulings in the interest of justice up until the entry of final judgment . . . ." Devers v. Devers, 471 N.J. Super. 466, 471-72 (App. Div. 2022) (quoting Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004), aff'd, 184 N.J. 415 (2005)). Thus, the trial court was not

bound by its pre-mistrial decision and could consider the new application defendant made concerning Papsun's testimony after the mistrial.

In that motion, the trial court had before it Papsun's trial testimony as well as her report and pretrial hearing testimony. In its written decision, the court accurately characterized her report and testimony. Papsun was able to conclude only that defendant had been exposed to cocaine sometime between forty-eight hours before the crash and when the blood sample was taken nearly five hours after the crash. Although she testified generally that the "crash side" of cocaine can make someone "really sleepy," she conceded she was not opining defendant was experiencing the "crash side" of cocaine while operating his car on June 4, 2019, and that she could not "say anything with decisiveness about cocaine in terms of the crash."

On that record, considering the elements of the crimes charged, we perceive no abuse of discretion or misapplication of the law in the court's order precluding in part Papsun's testimony. The trial court correctly concluded her BZE testimony did not support the State's theory that defendant's alleged Clonazepam intoxication had been exacerbated by the crash-side effects of cocaine. Her BZE testimony does not have the tendency to prove or disprove any fact under consideration in this case, and the little, if any, probative value it

21

might have is outweighed by its potential for undue prejudice. N.J.R.E. 403. Accordingly, we affirm the February 20, 2024 order granting in part defendant's motion regarding Papsun, precluding her testimony regarding defendant's alleged use of or impairment by cocaine or BZE.

Affirmed in part; vacated and remanded in part for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION